Sunbury Finance Company, Inc., Appellant, *v.*
Boyd Motor Co. et al.

Argued March 12, 1935.

Before KELLER, P. J.,
CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES
and RHODES, JJ.

*F. Brewster Wickersham,* of *Metzger & Wickersham,* for appellant.

*George L. Reed,* with him *William S. Bender* and *C. A. Wilson,* for appellee.

OPINION BY CUNNINGHAM, J., July 18, 1935:

The action below was replevin by the Sunbury Finance Company against the Boyd Motor Company, a retail dealer in automobiles. The subject of the replevin was a Ford truck, formerly in the possession of the defendant but removed from defendant's place of business (shortly before the issuing of the writ) by the Universal Credit Company, which had originally financed the purchase of the truck from Ford Motor Company. The Universal Credit Company intervened as a party defendant, filed a counter-bond, and took possession of the truck. The learned trial judge, HENRY, P. J., of the 52d Judicial District, specially presiding, directed a verdict in favor of the plaintiff, but subsequently entered judgment n. o. v. in favor of Universal Credit Company, the intervening defendant; hence this appeal by the plaintiff.

The truck in question had been shipped from the Ford plant at Chester to a bank at Harrisburg, with bill of lading and draft attached, accompanied by notice to the Boyd Motor Company of Lemoyne, Cumberland County, directing the delivery of the truck to it upon payment of a sight draft representing 10% of the pur-

chase price, and upon the signing of a document, entitled, "Trust Receipt." The Trust Receipt, after its execution by Boyd Motor Company, was sent to the Universal Credit Company, which paid the Ford Motor Company the balance of the purchase price and received a bill of sale from it for the truck. The body of the Trust Receipt read as follows:

"Received of UNIVERSAL CREDIT COMPANY the Motor Vehicles described above.

I (we) hereby acknowledge that said Motor Vehicles are the PROPERTY OF SAID UNIVERSAL CREDIT COMPANY and agree to take and hold the same, at my (our) sole risk as to all loss or injury, for the purpose of storing said property; and I (we) hereby agree to keep said Motor Vehicles brand new and not to operate them for demonstrating or otherwise, except as may be necessary to drive said Motor Vehicles from freight depot or from above city to my (our) place of business with all due care at my (our) risk en route against all loss and damage to said Motor Vehicles, Persons or Property, and to return said Motor Vehicles to said Universal Credit Company or its order upon demand; and pay and discharge all taxes, encumbrances and claims relative thereto. I (we) hereby agree not to sell, loan, deliver, pledge, mortgage, or otherwise dispose of any of said motor vehicles to any other person until after payment of corresponding amount shown on Dealer's Record of Purchase and Release of like identification number herewith. I further agree that the deposit made by me (us), in connection with this transaction, may be applied for reimbursement for any expense incurred by Universal Credit Company, in the event of breach of this Trust or repossession of said Motor Vehicles.

It is further agreed that no one has authority to vary the terms of this Trust Receipt."

The Universal Credit Company did not have posses-

sion of the truck at any time during the original transaction.

About a month after it received the truck, the Boyd Motor Company borrowed from plaintiff, Sunbury Finance Company, Inc., the sum of $400; as security for repayment of this loan, a "Lease Agreement," covering the truck, was executed by plaintiff as lessor and Boyd Motor Company as lessee. At the time of this second transaction, Boyd Motor Company informed plaintiff there were no liens against the truck, and plaintiff also satisfied itself that no certificate of title had been issued by the State Highway Department nor any conditional sale contract recorded. Plaintiff had the Boyd Motor Company procure from the department a certificate of title in its name, with an encumbrance noted thereon in favor of plaintiff in the amount of the loan, but left the truck in the possession of the Boyd Motor Company. On the day following the execution of the "Lease Agreement," the Universal Credit Company repossessed itself of the truck from Boyd Motor Company and stored it in a garage in Harrisburg, where it was seized four days later by the sheriff of Dauphin County under plaintiff's writ.

Upon these uncontroverted facts, plaintiff asks that we reverse the court below and enter judgment on the verdict. Its major contention is that, under many decided cases in this court and our Supreme Court, the transaction between the Universal Credit Company and the Boyd Motor Company placed the dealer in a position to commit a fraud upon an innocent third party, and that, as between the two finance companies, the intervenor must bear the loss. It is pointed out that the latter never had possession of the car and that, regardless of the paper transaction, the car was actually delivered to the dealer for sale, the intervenor merely financing the original purchase from Ford. Certain of

the cases cited in support of its position appear in the footnote.[*]

It is true that we have held that a transaction between a finance company and a dealer is not effective as against creditors of the latter and innocent purchasers for value where the instrument evidencing the nature of the transaction is in reality a conditional sale, and not a bailment lease; and further, that a "bailment lease" does not afford protection to the "bailor" as against such parties where the subject of the bailment is destined, nor for use but for sale, by the bailee. A summary of the decisions dealing with these and similar situations will be found in our recent case of General Motors Acceptance Corp. v. Hartman et al., 114 Pa. Superior Ct. 544, 174 A. 795. It is not necessary, however, for us to consider here whether the "Trust Receipt" should be placed in the same category as a bailment lease; and if so, whether it, in fact, contemplated a sale. Even if such were to be our conclusion, it would not help this plaintiff, because it is not a member of the class in whose favor those principles may be invoked. Plaintiff did not purchase the truck. Nor is it an execution creditor of the Boyd Motor Company. It is at most a pledgee, which has loaned a sum of money to the dealer and, as security, has caused the pledgor to execute, as lessee, the "Lease Agreement" above mentioned. It never even took the truck, the subject of the pledge, into its own possession.

As between the Universal Credit Company and the Boyd Motor Company, the transaction was a valid one. The truck was originally the property of the Ford Motor Company. It had a right to, and did sell it, by

---

[*] Root v. Republic Acceptance Corp., 279 Pa. 55, 123 A. 650. Commercial Motors Mortgage Corp. v. Waters, 280 Pa. 177, 124 A. 327. Hoeveler-Stutz Co. v. Cleveland Motor Sales, 92 Pa. Superior Ct. 92. Commercial Banking Corp. v. Meade, 104 Pa. Superior Ct. 447, 159 A. 180. H. L. Braham & Co. v. Surrell et al., 115 Pa. Superior Ct. 365, 176 A. 64.

the method of the ordinary bill of sale, to the Universal Credit Company. The latter in turn took from the Boyd Motor Company a Trust Receipt stating under what terms it had received and would hold the truck. There is nothing illegal about such a course of procedure. Performance of the obligations evidenced by the documents referred to, as between the original parties, could have been enforced according to their terms. We do not understand that this proposition is challenged. But it is equally true that one dealing, in turn, with the Boyd Motor Company is also bound by such documents, unless his rights are superior to those of the original parties. If the truck was, in fact, placed with the dealer with the intent that it might be sold, a purchaser from the latter, without notice of the paper transaction, would be protected under our decisions. As stated, however, the plaintiff did not purchase the truck. It merely lent money upon the strength of a pledge of the truck as security. Under such circumstances, it acquired merely the rights of the pledgor, and no more. It has no special equities under which to invoke the protection of the decisions referred to.

The identical situation was considered and ruled upon by this court in the case of Johnstown Automobile Co. v. Read, 96 Pa. Superior Ct. 143. There the plaintiff had delivered an automobile to its sales-agent, Myers, under a bailment lease, with authority to sell. The lease required the payment of a portion of the "rent" in cash, and the balance at the end of thirty days. Subsequently, the sales-agent pledged the car to the defendant as security for a personal loan. The defendant took possession of the car and of the certificate of title; the sales-agent failed to pay the loan; and defendant continued to retain possession. Under these circumstances, we affirmed a judgment in replevin for the plaintiff. Judge TREXLER there said: "As between Myers and the Johnstown Automobile Company, Myers

never became the owner of the car. He was, however, the recognized sales-agent and under our decision in the case of Hoeveler-Stutz Co. v. Bodman & Royer, 92 Pa. Superior Ct. 433, Myers could sell the car to any purchaser and pass the title to him. As to such purchasers, the bailment contract between the company and Myers would avail nothing, for the very purpose of the agency was to sell and in carrying out that purpose, the act of the agent was the act of the principal and the latter was estopped and could not gainsay the agent's authority. In this case, however, the defendant must rely upon his title, not upon any estoppel. He received no greater title than Myers had. As between Myers and the plaintiff, the [former] had no title, he was a bailee. The authority given to Myers, as a sales-agent, did not imply that he had a right to pledge the cars so received by him to raise money for his own purpose. The case of Hoeveler-Stutz Co. v. Bodman & Royer, supra, does not cover any such situation. If I deal with an agent, who is represented to the public as authorized to sell and receive the proceeds of such sales, and I purchase goods from him and pay him, my title to such goods can not be questioned by the agent's principal, but if the agent represents himself to be the owner of the goods and obviously for his own purposes pledges them, the principle stated in the above case does not apply. The pledgee must look to it that the title of his pledgor is that of owner and not merely agent in possession for the purpose of selling and for no other purpose. The bailee can not defeat the right of the owner by pledging the machine to a third person: Leitch v. Sanford Truck Co. et al., 279 Pa. 160, 165."

The same distinction will also be found in Newman v. Globe Indemnity Co., 275 Pa. 374, 378, 119 A. 488.

The Read case, indeed, presents an even more extreme situation than the present one, because there the

pledgee had actually taken possession of the car. Here the plaintiff urges against the intervening defendant the fact that the latter never had possession of the truck; but plaintiff, itself, never saw fit to take possession of the pledge. If the transaction between the intervening defendant and Boyd Motor Company was a subterfuge, certainly the later transaction between the Boyd Company and plaintiff falls into the same category.

As a subsidiary point, plaintiff claims that the intervening defendant is estopped to assert its title or right of possession to the truck because it had not registered its title with the Highway Department. In this connection, it cites the following statement from our decision in H. L. Braham and Co. v. Surrell et al., 115 Pa. Superior Ct. 365, 176 A. 64. "The plaintiff did not secure the certificate of title, which an owner of a motor vehicle in Pennsylvania,—except manufacturers, jobbers and dealers (section 201 (b), 75 PS §31 (b)),—is required by the Vehicle Code of 1929, P. L. 905, section 201 (a), to obtain. The plaintiff was not a manufacturer, jobber, or dealer of motor vehicles. Finance companies are not within the proviso of section 201 (b). Before it could become the lawful owner of this car, in Pennsylvania, with the right to sell or lease it within the state, appellant had to secure a certificate of title; and there is no evidence in the case that this was ever done by it."

It is contended that the provisions of the Act of 1929, dealing with the registration of title, are couched in different terms from those of earlier acts on the same subject; that under the later act there can be no legal title unless a certificate is obtained, or the owner comes within the stated exceptions; and that in the above quotation it is decided that a finance company is not included in this class.

This argument, however, ignores the factual situa-

tion presented in the case cited. There the dealer had received a car, and after receipt thereof had financed it through the plaintiff. Subsequently, the dealer sold the car to an innocent third party. We held that the latter was entitled to the car as against the finance company, for the reasons given above. The finance company, however, further claimed that it had in fact *purchased* the car from the distributor, and that the dealer had merely acted as its agent. We found, however, that there was no evidence to show that the transaction was other than one of a loan upon the security of the car; and in this connection pointed out that the finance company held no certificate of title, which, under the Act of 1929, it would have been required to obtain had it in fact purchased the car from the distributor. The applicable provisions of the Act of 1929 read as follows (Act of May 1, 1929, P. L. 905, Section 201): "(a) No person who is a resident of this Commonwealth shall own a motor vehicle in this Commonwealth unless a certificate of title therefor shall have been obtained as provided in this act; (b) Provided, That manufacturers and jobbers shall not be required to obtain certificate of title for new motor vehicles when consigned by such manufacturers or jobbers to dealers: And further provided, That dealers need not obtain certificate of title for new motor vehicles until and before sale thereof."

It is quite true that this section prohibits the ownership of a motor vehicle, with certain exceptions, unless a certificate of title is obtained. It is equally apparent, however, from a reading of these exceptions, that the legislature did not intend to require the obtaining of a certificate of title until a car is sold by a dealer—that is, until it leaves the showroom and goes into use upon the highways. Prior to that time, there exists no reason for the certificate. Since a manufacturer or jobber can own the car legally prior to sale by the

dealer, there is no reason why either cannot sell its rights in the car to a finance company, or why such rights should not have legal protection prior to the purchase of the car by a member of the public. This is the normal way in which a dealer finances his operations. Literally thousands of such transactions take place within this state every year. We do not understand it to be the intent of the statute that the financing company must obtain a certificate of title. The unreasonableness of such a rule becomes apparent in the situation where the dealer, prior to a sale of the car, pays off his obligation to the finance company. In such a case, if the construction contended for is correct, the finance company would have been required to obtain a certificate of title, but there would have been no outstanding certificate between the termination of the dealer's obligation and the sale of the car to a purchaser. This illustration makes it clear, we think, that while the legislature has, as a general proposition, outlawed ownership unless a certificate of title is obtained, the requirement applies only to one who claims to have obtained ownership from the dealer. In the Braham & Company case, the finance company was not in the position of the intervening defendant here. It did not finance the original transaction between the manufacturer and the dealer. It entered into the picture after the dealer received the car. Under such circumstances we held, and rightfully so, that if it wished to assert any rights with respect to the car as purchaser thereof, by the same token it was bound to meet the obligations of a purchaser in obtaining a certificate.

Our conclusion is that Universal Credit Company was entitled to judgment upon the whole record.

Judgment affirmed.