Commercial Banking Corporation, Appellant, *v.* Active Loan Company of Philadelphia.
Commercial Banking Corporation, Appellant, *v.* Reliable Auto Finance Company.

Argued October 13, 1938.

Before KELLER, P. J., CUN-NINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*William Potter Davis, Jr.,* for appellant.

*Abraham Wernick,* of *Evans & Wernick,* for appellees.

OPINION BY CUNNINGHAM, J., March 3, 1938:

These appeals by the plaintiff from two judgments, entered by the court below in favor of the respective defendants, arise out of transactions between a dealer in used automobiles and three finance companies concerning three cars. The suits were consolidated for trial before a judge of the municipal court, sitting without a jury, who made findings in each case in favor of

the plaintiff, aggregating $1049.80. Subsequently the court, in banc, sustained the defendants' exceptions to the findings and entered judgments in their favor, n. o. v., supported by an opinion by GLASS, J.,—the trial judge dissenting. As the questions of law involved upon plaintiff's appeals from the judgments so entered are identical, they will be disposed of in a single opinion.

Although the facts are complicated, and therefore must be stated at unusual length, there is no substantial dispute in the record concerning any of them. We are all of opinion the judgments should be affirmed.

Commercial Banking Corporation, the appellant, claiming a bailor's interest (by assignment from Morton M. Sladkin, trading as Morton Motors, Inc.) in three used automobiles—a Plymouth, a Ford Coupe and a Cord Sedan—brought actions of trespass against the Active Loan Company of Philadelphia, hereinafter referred to as Active, and the Reliable Auto Finance Company, hereinafter referred to as Reliable, the respective appellees, upon the theory that they, by seizing these cars from certain individual bailees thereof, fraudulently withheld, converted and applied to their own use, appellant's interest therein as bailor.

Reliable, appellee in No. 105, through its agents, seized the Ford Coupe and the Cord Sedan; the remaining car, the Plymouth Coupe, was seized by agents of Active, appellee in No. 104. Appellees had common officers at the time of the transactions here involved.

In support of its asserted right of action, appellant alleged and proved the following facts: On April 3, 1934, Sladkin, the dealer in used cars, having possession of the used Plymouth, leased it, under a bailment lease, to Bernard M. Carr. The lease for this car, as well as for the other two, was executed on a blank form furnished by appellant to Sladkin and bearing appellant's monogram; it named Sladkin as the bailor and Carr as the bailee, and provided for total rentals of $550, of which the bailee paid $175 down, leaving a balance of

$375 due Sladkin, payable in twelve monthly install-
ments of $31.25 each. Carr took possession of the
Plymouth the same day the lease was executed. Sladkin
did not show him any certificate of title nor did he
ask for one. Although Carr paid Sladkin for a transfer
of title and owner's tags he never received either.
Sladkin gave Carr a set of dealer's tags and a dealer's
license card on which the latter drove the Plymouth
until it was taken out of his possession by agents of
Active, while parked along a street, some two months
later—July, 1934.

On the same day the Carr lease was executed appel-
lant took an assignment thereof from Sladkin of his
bailor's interest therein. No cash was paid by appellant
to Sladkin for the assignment; it merely credited him
on an open account, the proceeds being applied to other
transactions between Sladkin and appellant. The
credit given Sladkin by appellant as payment for the
purchase of this lease was $250, with a conditional
allowance of $50 additional if the bailee made all pay-
ments. The balance of $75, out of the $375 due from
Carr, was to be retained by appellant as a financing
charge.

In purchasing from Sladkin his interest as bailor of
the Plymouth, appellant did not ask him for a certifi-
cate of title at the time of the transaction, nor did
appellant obtain a certificate at any time thereafter.
W. C. Atkinson, Jr., vice-president of appellant, testified
his company relied on the dealer to take care of the
titles, and that it was impractical to require them be-
cause of keen competition in the business of buying
leases. His testimony, on cross-examination, reads in
part as follows: "Q. I ask you at the time when these
bills of sale [bailments] were delivered to you did you
in each particular case ask for an assignment for the
certificate of title with warranty of title accompanied
by a statement of liens and encumbrances, together with
the names and addresses of the holders thereof, sworn

to before a notary public as required by Section 2 of the Act of 1929, later amended June the 22d, 1931? A. No, sir, we did not ask for the titles. Q. You did not ask for the titles? A. No, sir. Q. Then you admit that you did not comply with the provisions of that Act? A. I did not know that there was such an Act."

Carr made two payments of $31.25 each on May 4, and June 6, 1934, to appellant, leaving a balance due it from him at the time of the seizure of $312.50.

Appellant's suit against Reliable involved the purchase by it from Sladkin of two other leases, one covering the used Cord Sedan and the other the used Ford Coupe, and the subsequent seizure by agents of Reliable of these two cars. The transactions involving the Cord Sedan and Ford Coupe were identical with those above recited concerning the Plymouth, with the exception of differences in the names of the bailees, the dates of the leases and their assignments to appellant, and the amounts of rentals.

As respects these two later transactions, appellant's allegations and evidence showed that Sladkin leased the used Cord Sedan on May 4, 1934, to Harry Isaacman at a total rental of $508, the lessee making a down payment of $250 and agreeing to pay the balance of $258 in twelve monthly installments of $21.50 each.

Isaacman, likewise, did not ask to see Sladkin's certificate of title to the car he leased, but paid Sladkin for a transfer of the certificate of title and for owner's tags which he never received. He drove the car on dealer's tags (his own, he also being a dealer) until the latter part of July, 1934, when agents of Reliable took it out of his possession.

Appellant purchased the Isaacman lease from Sladkin the same day it was executed, May 4, 1934, by giving Sladkin credit on an open account. The bailee, Isaacman, made two payments to appellant of $21.50 each on June 8, and July 16, 1934, leaving a balance due appellant of $215. Appellant did not ask Sladkin for

any kind of a certificate of title to the Cord Sedan when it purchased the Isaacman lease from him, nor at any time thereafter. The above quoted testimony of W. C. Atkinson, Jr., also applies to this transaction.

The third used car, a Ford Coupe, was leased by Sladkin to Alfred H. Manuszak on May 7, 1934, the lease providing for a total rental of $696, the bailee paying $243 down and agreeing to pay the balance of $453 in twelve monthly installments of $37.75 each. Manuszak obtained possession the next day. He did not ask to see Sladkin's certificate of title and, although he paid him a dollar extra for twenty-four hour service for tags and title, he never obtained a certificate. Up until July 5, 1934, when the car was taken out of his possession by agents of Reliable, Manuszak drove it with dealer's tags. Appellant purchased the Manuszak lease from Sladkin on the same day it was executed, May 7, 1934, and credited Sladkin's account with $392 which was applied to a debt then owing by Sladkin to appellant on another car. Manuszak made two payments of $37.75 each to appellant on June 9, and July 10, 1934, leaving a balance due it at the time of seizure of $377.50.

It was on these facts that appellant based its alleged right to recover damages for conversion by Active of the Plymouth and by Reliable of the Cord and Ford.

On the other hand, Active alleged and proved these facts relative to the Plymouth car: On April 2, 1934, (the day before the lease to Carr and its assignment to appellant) Sladkin, having possession of the Plymouth and holding a certificate of title thereto in his name, executed a bill of sale for, and delivered possession of, the car to Active, receiving as payment therefor the check of Active in the amount of $300. The bill of sale and certificate were delivered to Joel Tzirlin, treasurer of Active. The certificate of title contained on its reverse side an assignment of the title, executed and notarized by Sladkin for Morton Motors, to Active; it

also contained an application by Active for title in its own name. This certificate remained in the safe of Active for several months and was finally sent to Harrisburg for a certificate in its own name; it was stamped "Approved For Issue" by the Department June 21, 1934, but Sladkin never had possession of it after it was delivered by him to Active.

After the Plymouth had been in Active's possession for some two or three hours for inspection by its mechanic, it was returned to Sladkin under a bailment lease, with the understanding that he would find a purchaser for the car and the purchaser would then deal directly with Active. Sladkin never repaid Active, but, in violation of his agreement, fraudulently leased it the next day to Carr and assigned his interest as bailor to appellant as already recited.

After repossessing the Plymouth, Active sold it for $237.50. Carr instituted a criminal prosecution against the agents of Active who had seized the Plymouth from him. Later, Active paid Carr $232.50 and obtained a release from him, releasing it from any liability growing out of the seizure by its agents of the Plymouth.

The other appellee, Reliable, came into the picture, as respects the Cord and Ford, in the same manner as did Active.

Sladkin executed a bill of sale covering the Cord and delivered the car to Reliable on May 4, 1934, receiving in return Reliable's check for $200. At the same time he also delivered to Joseph Stoddart, president of Reliable, a certificate of title to that car, issued by the Department of Revenue in the name of Frank L. Shoemaker; it contained an assignment by Shoemaker to Morton Motors, together with an application for a certificate, signed by Sladkin and requesting the issuance of a certificate in the name of Morton Motors, subject to an encumbrance of $200 in favor of Reliable. Reliable retained possession of this certificate until it was sent to Harrisburg and a new certificate issued in

its name, the application being stamped "Approved For Issue" May 16, 1934. Reliable, on the same day it received the car, returned it to Sladkin under a bailment lease. In this instance also the arrangement was that Sladkin would bring a buyer to Reliable. Later the same day Sladkin fraudulently leased the Cord to Isaacman and assigned the lease to appellant. After Reliable had repossessed the car from Isaacman, the latter bought it back for $200.

Sladkin sold and delivered the Ford to Reliable May 5, 1934, and received Reliable's check for $450 to his order. Simultaneously Reliable received from Sladkin a certificate of title to the Ford, issued in the name of Frank L. Shoemaker and containing an assignment by him to Morton Motors; it likewise contained an application by Morton Motors for title in its name, subject to an encumbrance in favor of Reliable in the amount of $450. Reliable retained possession of this certificate in its safe although it was stamped "Approved For Issue" by the Department of Revenue on May 16, 1934. After a few hours the Ford car was likewise returned by Reliable to Sladkin on a bailment lease, dated May 5, 1934, with the same oral understanding as to his securing a purchaser. Instead Sladkin fraudulently leased it to Manuszak and assigned his lease to appellant, as above stated.

After repossessing the Ford car on July 5, 1934, Tzirlin, acting for Reliable, sold it for $450. Manuszak brought suit against Reliable in trespass, June 5, 1935, to recover damages for the taking and detention of the Ford car, which suit was still pending at the time of the present trial.

The controlling question of law arising out of the above facts is whether appellant proved, at the trial, it had a title to the cars superior to the claim of the appellees.

Under the older rule, and historically, the plaintiff in an action of trover for conversion must have a prop-

erty in the chattel, general or special, *and* the actual possession or right to immediate possession at the time of the conversion: *Purdy v. McCullough,* 3 Pa. 466; *Overton v. Williston,* 31 Pa. 155; *Castor v. McShaffery,* 48 Pa. 437; *Duffield et al. v. Miller,* 92 Pa. 286, 289; *Gill v. Weston,* (No. 2) 110 Pa. 312, 1 A. 921; *Martin v. Megargee,* 212 Pa. 558, 560, 61 A. 1023; *Gunzburger v. Rosenthal,* 226 Pa. 300, 302, 75 A. 418; *Levy v. Terminal Warehouse Co.,* 121 Pa. Superior Ct. 95, 103, 183 A. 102; 65 Corpus Juris 56, Secs. 92, 93; Troubat & Haly's Practice, Vol. III, page 2217. In *Overton v. Williston,* supra, our Supreme Court held that an assignee of the title to personal property could not maintain trover where the alleged conversion took place *before* the assignment, stating, (page 160) : "Now, if there be any principle beyond dispute, it is that in an action of trover, the plaintiff must have had a right to the possession of the goods at the time of the conversion."

However, under the modern rule, where ownership in chattels is divided, as in the present case, under the bailment leases from Sladkin to the three respective bailees, an action of trespass for conversion of the interest of a bailor, or his assignee, will lie, even though the bailor be not technically entitled to possession (as against the bailee) at the time of the wrong. As stated in Harper on Torts, page 58, Section 29: "But the law now recognizes limited interests in chattels as well as limited or special interests in land, and although there may be no conversion within the old technical sense, as against the general owner not in possession nor entitled to it at the time of the wrong, it is recognized that an action on the case will lie by such owner for the harm done to his interest in the goods, in all cases in which the action of trover or trespass de bonis asportatis will lie by the possessor." See note, 25 H. L. R. 655, collecting authorities; also "Trover and

Conversion: An Essay" (1936), by Edward H. Warren, reviewed in 50 H. L. R. 374-376.

Thus far we have been speaking of ordinary chattels, and may assume that appellant, as assignee of Sladkin's interest as bailor of the cars, considered as mere chattels, would have had, prima facie, sufficient interest in them at the time of the alleged conversion to justify it in instituting the present actions, just as a bailor and bailee may each sue for damage to or loss of their respective interests in a chattel which is destroyed. Compare *Gen. M. Accept. Corp. v. B. & O. R. R. Co.,* 97 Pa. Superior Ct. 93; *National Bond & Investment Co. v. Gill,* 123 Pa. Superior Ct. 341, 187 A. 75. In this respect the present action differs from the claim of the plaintiff in *replevin* in the case of *Auto Bk. Corp. v. Atlas A. Fin. Corp. et al.,* 129 Pa. Superior Ct. 501, 195 A. 441, which, being entirely a *possessory* action for the recovery of a specific chattel (or its *full* value under a bond), made it necessary for the plaintiff in that case to show a right to immediate possession as against his bailee.

Since, however, Reliable and Active denied appellant had any title to the cars here in question and asserted title in themselves, it was clearly incumbent upon appellant to show a better title to the cars than they had. Compare *Winlack v. Geist & Thomas,* 107 Pa. 297; Troubat & Haly's Practice, Vol. III, supra, page 2220. In this respect the rule is the same as in replevin where a defendant denies plaintiff's title and claims a superior one. Compare *Sunbury Fin. Co. Inc. v. Boyd M. Co.,* 119 Pa. Superior Ct. 412, 419, 180 A. 103.

Appellees' claim of title was based on a sale of the cars to it by Sladkin, accompanied by an assignment of his certificates of title thereto, possession for a few hours, and an immediate bailment back to Sladkin. This device gave appellees a claim on the cars at least as between themselves and Sladkin, although the transaction was constructively fraudulent as to bona fide

purchasers from Sladkin and as to his creditors, because there was not a sufficient transfer of possession: *Auto Bk. Corp. v. Atlas A. Fin. Corp. et al.*, supra, and cases cited at pages 507 and 508 of that opinion, including *Bowersox v. Weigle & Myers*, 77 Pa. Superior Ct. 367; *Root v. Republic Acceptance Corp.*, 279 Pa. 55, 123 A. 650. We, however, are not here concerned with the rights of Sladkin's bailees as against Active and Reliable.

We think the pivotal point in these cases is that the cars were not ordinary chattels; they were motor vehicles, the ownership and sale of which are regulated by "The Vehicle Code" of 1929 and its amendments.

It seems a fair inference from the record that appellant, in conducting the transactions here involved, was simply trafficking in bailment leases of automobiles in utter disregard of the spirit and letter of the statute. It did not make even a pretense of attempting to comply with its provisions. The appellee finance companies appear to have been engaged in lending money on cars and camouflaging their methods with fictitious bills of sale and bailment leases. The latter made at least a show of complying with the code. Sladkin evidently was willing to defraud all three finance companies with a fine degree of impartiality. He borrowed all he could from appellees upon the three cars, got them back into his possession, leased them to three individuals under the pretense that he owned them, appropriated the down payments to his own use, sold his interest in the leases to appellant for the highest price the latter would pay, and then stepped out of the picture.

When Sladkin sold his bailor's interest in each of the three leases to appellant he, by reason of the prohibitions contained in Section 201 of Art. II of "The Vehicle Code" of May 1, 1929, P. L. 905, as amended June 22, 1931, P. L. 751, 75 PS §31, had no legal right to own or dispose of the cars covered by those leases. He was neither a manufacturer, jobber, nor dealer in

new cars; he was a dealer in used cars and the automobiles had "gone into use upon the highways" (*Sunbury Finance Co. v. Boyd Motor Co.*, supra), long before the dates of the leases. It is expressly enacted in that section that no such person shall, under the penalty therein provided, "own a motor vehicle ...... unless a certificate of title therefor shall have been obtained as provided in [the] act."

We held in *Auto Bk. Corp. v. Atlas A. Fin. Corp.*, supra, (at pages 508-9) that under our present vehicle code a certificate of title is a necessary incident to ownership of a used automobile. What was there said upon that subject is applicable here. Under the above quoted admission of appellant's vice-president, not the slightest effort was made by it to ascertain whether Sladkin had a certificate of title of any kind to the cars when he executed to his respective bailees the leases appellant was about to buy. It is perfectly clear, under this record, that he had none.

By Section 203 it is directed that the certificate shall contain "a statement of any liens or encumbrances" upon the motor vehicle, together with the name and address of the holder. It is also provided that if there be any lien or encumbrance "the certificate of title shall be delivered to the person holding the first lien or encumbrance ...... and be retained by such person until the entire amount [thereof] is fully paid by the owner." Section 207 contains provisions for the assignment of certificates of title "in the event of the sale or transfer of the ownership of a motor vehicle."

Appellant bases its right to recover in these cases solely upon the proposition that by purchasing from Sladkin the three bailment leases he had executed to Carr, Isaacman and Manuszak, it stepped into his shoes, became the holder of the first encumbrance upon each car, and acquired all his rights against the bailees and against the world. As Sladkin was expressly prohibited by the statute from owning or leasing the cars

without obtaining certificates of title in the manner therein provided, appellant obtained nothing by its purchase which the law will protect. If it feels aggrieved, it has no one but itself to blame. In its eagerness to make a few dollars on each lease, it ignored the provisions of the code designed for its protection.

The judgments are severally affirmed.